IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
(Orlando Division)

Case No.: 6:21-cv-173-Orl-ACC-GJK

KIMBERLY VANDERBILT,
in her individual capacity, and

WINSTON DECAMBRE,
in his individual capacity,

Plaintiffs,

v.

JOHN W. MINA,
in his Official Capacity as Sheriff of Orange County,

JEREMY GATZY,
in his individual capacity, and

DERRICK FARIAS RIOS,
in his individual capacity,

Defendants.

_____/

## AMENDED COMPLAINT AND JURY DEMAND

COMES NOW, Plaintiffs, KIMBERLY VANDERBILT[1] and WINSTON DECAMBRE,

in their individual capacities, by and through undersigned counsel, and sue Defendants, JOHN W.

MINA, in his official capacity as Sheriff of Orange County, Florida, JERMEY GATZY, in his

individual capacity, and DERRICK FARIAS RIOS, in his individual capacity, for the violation of

the Plaintiffs' constitutional rights and seizure of the Plaintiffs' personal property, a dog named

"Audi." The following is stated in support thereof:

---

[1] Kimberly Vanderbilt legally changed her married name, "DeCambre," to her maiden name "Vanderbilt."

## I. <u>NATURE OF THE ACT</u>

1.      This is a civil action brough pursuant to 42 U.S.C. § § 1983 and 1988 for relief through compensatory damages, declaratory, injunctive, and equitable relief, and attorney's fees stemming from Defendants' violations of Plaintiffs' rights guaranteed by the Fourth Amendment of the Constitution of the United States.

2.      Defendants conduct under the color of state law proximately cause the deprivation of Plaintiffs' federally protected rights.

## II. <u>JURISDICTION AND VENUE</u>

3.      This action arises under the Constitution and laws of the United States, including 42 U.S.C. §§ 1983 and 1988.

4.      Declaratory, injunctive, and equitable relief is sought pursuant to 28 U.S.C. §§ 2201 and 2202.

5.      Compensatory damages are sought pursuant to 42 U.S.C. § 1983.

6.      Costs and Attorney's fees may be awarded pursuant to 42 U.S.C. § 1983 and Fed. R. Civ. P. Rule 54.

7.      Jurisdiction is conferred upon this Court pursuant to 11 U.S.C. § 1331.

8.      Venue is proper in the Middle District of Florida, under 28 U.S.C. § 1391. All events alleged herein occurred within the State of Florida, and all the parties are residents within this judicial district.

## III. <u>PARTIES</u>

9.      Plaintiff KIMBERLY VANDERBILT (hereinafter "KIMBERLY") is a homeowner and resident in the City of Orlando, Orange County, Florida.

10.     At all times material hereto, KIMBERLY was, and still is, a caregiver for a dog named Audi.

11.     WINSTON DECAMBRE (hereinafter "WINSTON") is a resident in the City of Orlando, Orange County, Florida.

12.     At all times material hereto, WINSTON was, and still is, the registered owner and caregiver for a dog named Audi.

13.     At all times material hereto, Defendant, JEREMY GATZY (hereinafter "GATZY"), was acting under color of the law as a deputy sheriff for Orange County, Florida, in the course of carrying out the actions and omissions that violated Plaintiffs' rights.

14.     At all times material hereto, Defendant, DERRICK FARIAS RIOS (hereinafter "FARIAS RIOS"), was acting under color of the law as a deputy sheriff for Orange County, Florida, in the course of carrying out the actions and omissions that violated Plaintiffs' rights.

15.     At all times material hereto, Defendant, JOHN W. MINA (hereinafter "SHERIFF MINA") was acting in his official capacity as the employing supervisor of the Defendant Deputies, and is vicariously liable for any negligent actions of his employees under the doctrine of respondeat superior. Defendant MINA was also responsible for enforcing the rules and regulations of the Orange County Sheriff Office ("OCSO").

## IV. FACTUAL ALLEGATIONS

16.     At all times material hereto, WINSTON owned a three-year-old female dog, named "Audi."

17.     At all times material hereto, Audi was, and still is, a family companion pet; a sentient, loving, and friendly dog who would peacefully walk throughout her neighborhood with Plaintiffs.

18.     Audi has no history of violating animal control provisions or acting in an aggressive manner within the City of Orlando, or elsewhere.

19.     At all times hereto, Plaintiffs resided at real property located at 1867 Yukon Drive, Orlando, Orange County, Florida 32818 (hereinafter "Plaintiffs' home").

20.     The north gate leading into the backyard of Plaintiffs' home has a prominent metal cutout of a dog on top.

21.      There is a posted warning sign that states "BEWARE OF THE DOG" on the side rear window located in the backyard of Plaintiffs' home.

 

22.     The signs are conspicuously displayed at Plaintiffs' home in a manner to put anyone on notice that dogs reside on the property.

23.     Plaintiffs' dogs, including Audi, reside within the home.

24.     Plaintiffs posted notices outside the home due to the dogs' ability to have access from their home to the gated backyard through a doggy door.

25.     Plaintiffs ensure that the gated backyard is sanitary and clean, often picking up and

disposing of dog waste.

26.     Plaintiffs have converted an outdoor shed located in the backyard of the Plaintiffs' home

to a doghouse for the dogs.

### *May 30, 2018 Incident*

27.     On May 30, 2018, a warrant was issued for the arrest of Leroy Deleon King III, for alleged

robbery via "sudden snatching" an iPhone.

28.     On May 30, 2018, OSCO deputies received a tip that Leroy Deleon King III may be located

at 1868 Wayside Drive, Orlando, Orange County, Florida 32818 ("1868 Wayside Drive").

29.     1868 Wayside Drive is located directly behind the Plaintiffs' home.



30.     On May 30, 2018, OCSO deputies arrived within the vicinity of 1868 Wayside Drive in order to serve the warrant on Leroy Deleon King III.

31.     GATZY with K9 Draco and FARIAS RIOS arrived within the vicinity of the Plaintiffs' home.

32.     GATZY with K9 Draco and FARIAS RIOS intended to enter the Plaintiffs' gated backyard to observe the rear of 1868 Wayside Drive.

33.     When GATZY with K9 Draco and FARIAS RIOS arrived at the Plaintiffs' home, the inside house lights were on and cars were present in the driveway.

34.     It was clear that the Plaintiffs were within their home at 1867 Yukon Drive.

35.     GATZY and FARIAS RIOS failed to seek consent to enter onto the private property of the Plaintiffs.

36.     GATZY with K9 Draco and FARIAS RIOS made the conscious decision to go through the North gate, disregarding the conspicuous dog cutout, and entered the gated backyard of the Plaintiffs' home.

37.     GATZY with K9 Draco and FARIAS RIOS continued their entry further into the backyard of the Plaintiffs' home despite the "BEWARE OF THE DOG" sign conspicuously displayed on the property.

38.     GATZY and FARIAS RIOS consciously disregarded the signs advising that dogs are currently on the premises.

39.     During entry into the gated backyard of the Plaintiffs' home, FARIAS RIOS made eye contact with KIMBERLY through her bedroom window which faces the backyard.

40.     KIMBERLY opened her bedroom window to ask the law enforcement officers why they were on her property.

41.     FARIAS RIOS gestured KIMBERLY to refrain from speaking by placing his finger to his lips.

42.     GATZY with K9 Draco and FARIAS RIOS continued entry into the gated backyard of the Plaintiffs' home without giving KIMBERLY an opportunity to voice her objection to their presence on her private property.

43.     As a direct result FARIAS RIOS' actions, KIMBERLY was prevented from inquiring the reason for their presence on her property.

44.     As a direct result FARIAS RIOS' actions, KIMBERLY was prevented from notifying the deputies of the presence of the dogs on the property.

45.     As a direct result of GATZY with K9 Draco and FARIAS RIOS' continued entry into the gated backyard of the Plaintiffs' home, KIMBERLY was prevented from ensuring that Audi was safely inside the house and not in the backyard.

46.     There were no exigent or emergency circumstances that required GATZY with K9 Draco and FARIAS RIOS to enter the gated backyard of the Plaintiffs' home without consent of the property owner.

47.     There were no exigent or emergency circumstances that required GATZY with K9 Draco and FARIAS RIOS, to enter the gated backyard of the Plaintiffs' home without ensuring that the personal property of the owner, the dogs, were secured.

48.     During this time, other OCSO deputies made contact with a resident of 1868 Wayside Drive and the resident denied having any knowledge of the suspect Leroy Deleon King III.

49.     KIMBERLY was disturbed by the sight of armed deputies and a K9 in her gated backyard and quickly went to locate WINSTON and the family dogs.

50.     KIMBERLY assumed that the OCSO deputies had notified WINSTON of their presence on the property without her knowledge.

51.     KIMBERLY walked towards WINSTON's room to make sure he had secured the family dogs in the home.

52.     As KIMBERLY was walking to WINSTON's room, she heard multiple gunshots originating from her backyard.

53.     Upon information and belief, when GATZY with K9 Draco and FARIAS RIOS entered into the gated backyard of the Plaintiffs' home, the family dogs were sleeping in their outdoor doghouse.

54.     The dogs exited the doghouse and approached GATZY with K9 Draco and FARIAS RIOS within the gated backyard.

55.     Audi is a medium sized dog and considerably smaller than K9 Draco.

56.     GATZY and FARIAS RIOS failed to retreat from the gated backyard of the Plaintiffs' home when approached by the dogs on the property.

57.     GATZY and FARIAS RIOS failed to utilize any non-lethal methods of deterring the dogs' approach.

58.     Rather, GATZY and FARIAS RIOS discharged their OCSO assigned firearms and collectively shot eight (8) rounds directly aimed at the dogs.

59.     The deputies did not strike the male dog, who became frightened and ran away to another area of the yard.

60.     The deputies struck Audi multiple times with the deadly force of their firearms.

61.     After hearing gunshots, KIMBERLY immediately and frantically ran to her bedroom window and saw her dog Audi lying down bleeding out.

62.     KIMBERLY then immediately ran outside.

63.     After hearing gunshots, WINSTON immediately and frantically ran out the backdoor of the house and an OCSO deputy pointed his firearm at WINSTON, and then at the Plaintiffs' male dog.

64.      WINSTON kept his hands up in the air pleading with the OCSO deputy to not shoot the male dog.

65.     WINSTON was emotionally distraught at the sight of his bleeding dog, the fear of his male dog being shot, and the fear of having a firearm pointed at him.

66.     KIMBERLY was emotionally distraught at the sight of her bleeding dog, the fear of her male dog being shot, and the fear of her son being shot by the OCSO deputy that was pointing a gun at WINSTON.

67.     GATZY placed K9 Drako into his patrol vehicle, while WINSTON and another deputy began applying pressure to the gunshot wounds on Audi.

68.     WINSTON wept and consoled Audi as he attempted to slow the bleeding.

69.     KIMBERLY begged GATZY and FARIAS RIOS to transport Audi to an emergency veterinary clinic.

70.     OCSO deputies declined her pleas and advised that Orange County Animal Control ("Animal Control") needed to arrive at the scene and make a report.

71.     OCSO deputies prevented Plaintiffs from leaving the property to seek veterinary treatment for Audi who was profusely bleeding from the multiple bullet wounds.

72.     Animal Control arrived at the Plaintiffs' home approximately twenty minutes after Audi was shot.

73.     The delay prevented the Plaintiffs from seeking immediate emergency veterinary care for Audi.

74.     KIMBERLY and WINSTON were still emotionally distraught when Animal Control arrived.

75.     Due to their emotional distress, KIMBERLY and WINSTON had difficulty concentrating on the Animal Control Officer's questions.

76.     The Animal Control Officer wrote a report and refused to transport Audi.

77.     The Animal Control Officer advised KIMBERLY of a location to drive Audi for treatment that was approximately thirty-five minutes away.

78.     KIMBERLY advised that it was too far, as Audi needed lifesaving treatment immediately and was suffering.

79.     The Animal Control Officer advised of a closer emergency veterinarian and required KIMBERY and WINSTON to personally transport Audi for emergency veterinary care.

80.     KIMBERLY wrapped Audi in a blanket and WINSTON held Audi to slow the bleeding from the gunshot wounds.

81.     Upon examination at the emergency veterinarian clinic, the Plaintiffs were informed that Audi needed immediate surgery and hospitalization to treat her injuries.

82.     The Plaintiffs were advised that they needed to consent to the emergency surgery and pay a one-thousand-dollar ($1,000.00) deposit prior to the surgery taking place.

83.     The Plaintiffs did not have the funds readily available and were emotionally distraught, begging for the veterinarian to perform the lifesaving surgery regardless of their inability to pay up front.

84.     After much discussion and delay, OCSO deputies advised the veterinarian to perform the surgery.

85.     Audi survived the surgery but required extensive in-home care afterwards due to nerve damage, remaining bullet fragments, and gastrointestinal complications due to the multiple gunshot wounds.

86.     As a result of the incident, WINSTON missed multiple weeks of work to care for Audi, who could not walk and needed assistance to relive herself.

87.     WINSTON and KIMBERLY experienced, and still experience, emotional distress as a result of GATZY and FARIAS RIOS' actions.

88.     As a result of his emotional distress, WINSTON was unable to sleep for weeks following the May 30, 2018 incident.

89.     WINSTON has developed anger and anxiety as a result of this incident and subsequently does not feel safe in the presence of law enforcement.

90.     As a result of her emotional distress, KIMBERLY was unable to sleep for weeks following the May 30, 2018 incident.

91.     KIMBERLY has distressing flashbacks to the sight of Audi bleeding and a gun being pointed at her son, and as a result, does not feel safe in the presence of law enforcement.

92.     Audi continues to have anxiety and will become fearful and immobile at the sight of law enforcement officers during walks around the neighborhood.

93.     Audi continues to suffer from gastrointestinal issues due to gunshot wounds in her gut, nerve damage, and a permanent limp due to bullet fragments remaining in her body.

94.     While Audi is still a much-loved member of the Plaintiffs' family, Audi is not the same

dog and companion to WINSTON as she was before she was physically injured as a direct result

of GATZY and FARIAS RIOS' actions of discharging their firearms and shooting the dog.

### *Orange County Sheriff's Office Policies and Procedures*

### *A. Citizen Rights*

95.     OCSO policies and procedures mandate a strong commitment to the community and

enhancement of the quality of life throughout Orange County, Florida.

96.     Citizens of Orange County, Florida have a right to an enhanced quality of life, which

includes the right to not have their property unreasonably damaged.

97.     The unreasonable damage to property is a violation of the standard operating procedures

of OCSO, state, and federal laws.

98.     Citizens of Orange County, Florida have a right to an enhanced quality of life, which

includes the right to withhold consent to law enforcement officers on their private property, absent

exigent circumstances.

99.     The entry of law enforcement officers on private property without consent of the property

owner and absent exigent circumstances is a violation of the standard operating procedures of

OCSO, state, and federal laws.

100.    Citizens of Orange County, Florida have a right to an enhanced quality of life, which

includes the right to not be fearful of law enforcement officers violating their civil rights.

101.    Actions of law enforcement officers that reasonably make a citizen fearful of the violation

of their civil rights is a violation of the standard operating procedures of OCSO, state, and federal

laws.

102.     OCSO policies and procedures mandate that personnel will comply with the laws, ordinances, rules, governing the agency, and also the United States Constitution, the State of Florida Constitution, and any subdivision constitution.

103.     OCSO policies and procedures mandate that employees cherish and protect the rights, liberties, and freedoms of all, as granted by the United States and Florida constitutions.

104.     Citizens of Orange County, Florida have a right to be free from unreasonable searches.

105.     Unreasonable searches are a violation of the standard operating procedures of OCSO, state, and federal laws.

106.     Citizens of Orange County, Florida have a right to be free from unreasonable entry unto their private property.

107.     Unreasonable entry unto private property is a violation of the standard operating procedures of OCSO, state, and federal laws.

108.     Citizens of Orange County, Florida have a right to be free from unreasonable seizures of person and personal property.

109.     Unreasonable seizures of person and personal property is a violation of the standard operating procedures of OCSO, state, and federal laws.

*B. Use of K9 Teams*

110.     OCSO policies and procedures mandates that K9 teams be deployed using great caution and only after careful consideration of the circumstances.

111.     A K9 team deployed without consideration of the circumstances is in violation of the standard operating procedures of OCSO.

112.     OCSO policies and procedures mandates that K9 teams are authorized to be used for: tracking, searching, crowd control, public relations, and public safety.

113.    A K9 team deployed for any other purpose not specifically authorized by Defendant MINA

is a violation of the standard operating procedures of OCSO.

114.    OCSO policies and procedures mandates a K9 can be used for criminal apprehension after

considering: the severity of the crime, whether the suspect poses an immediate threat, whether the

suspect is resisting, or whether the suspect evading arrest by flight.

*C. Use of Force*

115.    OCSO policies and procedures prohibit the use of more force than is reasonably necessary

based on the circumstances of a situation.

116.    The use of more force than is reasonably necessary based on the circumstances of a

situation is a violation of the standard operating procedures of OCSO.

117.    OCSO policies and procedures mandate that the use and degree of force depend on the

characteristics of the living being it is used against.

118.    The failure to consider the characteristics of the living being upon which deadly force is

used against is a violation of the standard operating procedures of OCSO.

119.    OCSO policies and procedures permits deadly force only when there is a high potential for

great bodily harm or death, and when deadly force is a last resort.

120.    The use of deadly force when there is not a high potential for great bodily harm or death is

a violation of the standard operating procedures of OCSO.

121.    The use of deadly force as a first resort is a violation of the standard operating procedures

of OCSO.

122.    OCSO policies and procedures define deadly force as a force that is likely to cause death

or great bodily harm, permanent disability, and permanent disfigurement.

123.    OCSO policies and procedures define deadly force as including the firing of a firearm in a direction regardless of intent to kill or cause great bodily harm.

124.    OCOS policies and procedures mandate that deputies must intervene if they anticipate or observe any unreasonable, unnecessary, or disproportionate use of force.

125.    The failure of a deputy to intervene if he or she anticipates or observes any unreasonable, unnecessary, or disproportionate use of force is a violation of the standard operating procedures of OCSO.

126.    OCSO policies and procedures provide that other methods to subdue potential harm should be used before deadly force, including but not limited to chemical agent aerosol spray, expandable batons, flashlights, electronic control devises, or other less lethal weapons at their disposal.

127.    The failure to use other methods to subdue potential harm prior to deadly force is a violation of the standard operating procedures of OCSO.

128.    OCSO policies and procedures mandate that less lethal weapons should be considered where their use can reduce injury to officers, citizens, or suspects.

129.    OCSO policies and procedures define a less lethal weapon as a projectile designed to stun, temporary incapacitate, or cause temporary discomfort without penetrating the body.

130.    OCSO policies and procedures state that less lethal impact weapons can achieve the goal of protection of life and restoring order.

131.    OCSO policies and procedures mandate that lethal impact weapons should be deployed only after all other options to control or apprehend a suspect have been considered unless exigent circumstances are present.

132.    The failure to use other less lethal impact weapons to control or apprehend a suspect, absent exigent circumstances, is a violation of the standard operating procedures of OCSO.

133.      OCSO policies and procedures state that weapons cannot be used or handled in a careless or imprudent manner.

134.      The use of weapons in a careless or imprudent manner is a violation of the standard operating procedures of OCSO.

*D. Interactions with Animals*

135.      OCSO policies and procedures define a dangerous animal as one that poses a clear and imminent danger or threat to public safety due to vicious behavior, or rabies.

136.      An animal that does not exhibit characteristics of rabies or vicious behavior cannot be defined as dangerous by the OCSO.

137.      OCSO policies and procedures defines domestic animals as tame animals, such as dogs, that are kept as pets in homes.

138.      Domestic animals are classified as property of their owners and therefore, protected under state and federal law from unreasonable seizures.

139.      OCSO policies and procedures mandate that killing or seriously wounding a dangerous animal is permitted only when all other dispositions are impractical.

140.      The killing or serious wounding of a non-dangerous animal is a violation of the standard operating procedures of OCSO, state, and federal law.

141.      The killing or serious wounding of a dangerous animal when other dispositions are practical is a violation of the standard operating procedures of OCSO, state, and federal law.

142.      OCSO policies and procedures mandate that deputies may discharge their weapon to kill or seriously injure a dangerous animal, but only after all reasonable means of disposition have been exhausted.

143.     The use of discharging a weapon to kill or seriously injure a non-dangerous animal is a violation of the standard operating procedures of OCSO, state, and federal law.

144.     The use of discharging a weapon to kill or seriously injure a dangerous animal before all reasonable means of disposition have been exhausted is a violation of the standard operating procedures of OCSO, state, and federal law.

145.     According to OCSO policies and procedures, when killing or seriously wounding a dangerous animal, deputies should contact the sergeant and obtain approval when possible, and also exhaust all efforts to notify the owner for permission to destroy the animal.

146.     The failure to exhaust all efforts to notify the owner prior to destroying the domestic animal is a violation of the standard operating procedures of OCSO, state, and federal law.

### Violations of Orange County Sheriff's Office Policies and Procedures

#### A. Citizen Rights

147.     On May 30, 2018, GATZY and FARIAS RIOS failed to follow the policies and procedures set out by OCSO regarding Citizen Rights.

148.     As a direct and proximate cause of failing to follow the policies and procedures set out by OCSO regarding Citizen Rights, the Plaintiffs' dog, Audi, was unreasonably and permanently damaged.

149.     GATZY and FARIAS RIOS entered the Plaintiffs' gated and private backyard without consent and absent exigent circumstances.

150.     FARIAS RIOS precluded KIMBERLY from giving consent or voicing her objection by motioning for her to remain silent after she observed the deputies in the Plaintiffs' fenced private backyard.

151.    FARIAS RIOS precluded KIMBERLY from advising the deputies of the presence of dogs on the property by motioning for her to remain silent after she observed the deputies in her gated private backyard.

152.    GATZY and FARUAS RIOS consciously disregarded multiple warning signs indicating dogs were on the property.

153.    GATZY and FARUAS RIOS consciously disregarded that the Plaintiffs were home and therefore, the opportunity to ask permission before entry into the gated private backyard.

154.    As a direct and proximate cause of FARIAS RIOS' actions, KIMBERLY was unable to secure the family dogs within the Plaintiffs' home, resulting in the deputies' discharge of their firearms, an action that severely and permanently injured Audi.

155.    KIMBERLY and WINSTON are still coping with the May 30, 2018 incident and lingering effects that occurred as a result, as they are emotionally scarred, no longer feel safe in their home, and no longer feel protected by law enforcement.

156.    GATZY and FARIAS RIOS' actions have resulted in the Plaintiffs being reasonably fearful of their civil rights being violated by law enforcement officers.

157.    GATZY and FARIAS RIOS' actions did not protect the rights, liberties, and freedoms of the Plaintiffs to be free from unreasonable searches.

158.    GATZY and FARIAS RIOS' actions did not protect the rights, liberties, and freedoms of the Plaintiffs to be free from unreasonable seizures.

159.    GATZY and FARIAS RIOS failed to comply with the United States Constitution and the State of Florida Constitution.

160.    As a direct and proximate cause of GATZY and FARIAS RIOS's actions on May 30, 2018, the Plaintiffs' civil rights to be free from unreasonable searches and seizures were violated.

*B. Use of K9 Teams*

161.    On May 30, 2018, GATZY failed to follow the policies and procedures set out by OCSO in regard to the Use of K9 Teams.

162.    GATZY failed to use great caution and careful consideration of the present circumstances when entering into the gated private backyard of a residence with K9 Drako without notifying the homeowner and requesting permission.

163.    GATZY failed to use great caution and careful consideration of the circumstances when entering into the gated private backyard of a residence with K9 Drako that contained multiple signs indicating dogs were on the premises.

164.    GATZY entered the gated private backyard of a residence with K9 Drako for the purpose of observing the backyard of the house directly behind the Plaintiffs' home.

165.    This intended purpose was not for tracking, searching, crowd control, public relations, and public safety and therefore, K9 Drako should not have accompanied GATZY into the Plaintiffs' gated private backyard.

166.    This intended purpose was not for criminal apprehension and therefore, K9 Drako should not have accompanied GATZY into the Plaintiffs' gated private backyard.

*C. Use of Force*

167.    On May 30, 2018, GATZY and FARIAS RIOS failed to follow the policies and procedures set out by the OCSO in regard to Use of Force.

168.    GATZY and FARIAS RIOS resorted to deadly force immediately upon being approached by the dogs on the property.

169.    GATZY and FARIAS RIOS were put on notice that it was reasonably likely that dogs may reside on the property and may be in the gated backyard of the Plaintiffs' home.

170.    Neither GATZY or FARIAS RIOS attempted to intervene and require caution prior to entry into the gated backyard, as it was reasonable that there would be an anticipated use of force if approached by dogs on the property.

171.    GATZY and FARIAS RIOS failed to utilize any less lethal weapons in the event of coming into contact with dogs on the property.

172.    GATZY and FARIAS RIOS failed to consider the use of less lethal weapons when such use could have reduced injury to the Plaintiffs.

173.    GATZY and FARIAS RIOS failed to consider the use of less lethal weapons when such use could have achieved the goal of protecting Audi's life, instead of leaving the dog permanently damaged.

174.    GATZY and FARIAS RIOS failed to use other methods to subdue potential harm before resorting to deadly force, including but not limited to the failure to use chemical agent aerosol spray, expandable batons, flashlights, electronic control devises, or other less lethal weapons at their disposal.

175.    GATZY and FARIAS RIOS failed to attempt to deter the dogs by discharging their firearms away from the dogs in order to frighten them.

176.    GATZY and FARIAS RIOS used more force than was reasonably necessary to deter the domestic dogs that were awakened by their entry into the Plaintiffs' gated backyard.

177.    GATZY and FARIAS RIOS failed to consider the characteristics of the dogs upon which deadly force was used against.

178.    Audi is not a large dog and does not have characteristics that would require the use of lethal force immediately upon confrontation.

179.     Audi did not present a high potential for great bodily harm or death to the deputies or K9

Drako.

180.     GATZY and FARIAS RIOS' use of weapons was careless and/or imprudent.

181.     GATZY and FARIAS RIOS used deadly force as a first resort, which directly contravenes

the OCSO policies and procedures.

182.     As a result of the use of deadly force as a first resort, the Plaintiffs' dog, Audi, has been

permanently damaged.

183.     The use of deadly force as a first result was unduly excessive and a violation of the

Plaintiffs' rights to be free from unreasonable seizures.

*D. Interactions with Animals*

184.     On May 30, 2018, GATZY and FARIAS RIOS failed to follow the policies and procedures

set out by OCSO regarding Interactions with Animals.

185.     Audi is a domestic animal; in that she is tame and resides within the Plaintiffs' home.

186.     Audi was not exhibiting characteristics of rabies when she approached GATZY and

FARIAS RIOS in the gated backyard.

187.     Audi was not exhibiting vicious behavior when she approached GATZY and FARIAS

RIOS in the gated backyard.

188.     Audi did not pose a clear and imminent danger or threat to public safety when she

approached GATZY and FARIAS RIOS in the gated backyard.

189.     Audi was not a dangerous animal.

190.     GATZY and FARIAS RIOS failed to use any other non-lethal means practical to deter

Audi from approaching them in the gated backyard.

191.     GATZY and FARIAS RIOS first utilized to deadly force against Audi.

192.    GATZY and FARIAS RIOS seriously wounded Audi when other dispositions were practical, such as discharging their firearms nearby to frighten Audi or using less lethal weapons.

193.    GATZY and FARIAS RIOS failed to exhaust all reasonable means of disposition prior to resorting to discharging their weapons in an attempt to kill or seriously injury Audi.

194.    GATZY and FARIAS RIOS failed to make any attempts to receive consent from KIMBERLY to enter the gated backyard, and in fact FARIAS RIOS precluded KIMBERLY from communicating with the deputies and notifying them of the presence of the dogs.

### *Failure to Ensure Proper Training and Compliance with Standard Operating Procedures*

195.    Defendant MINA failed to properly train GATZY and FARIAS RIOS to ensure compliance with their standard operating procedures.

196.    Defendant MINA's failure to properly train GATZY and FARIAS RIOS resulted in the disregard for policies and procedures set in place to protect the civil rights of citizens such as KIMBERLY and WINSTON.

197.    As a result, the civil rights and constitutional protections afforded to KIMBERLY and WINSTON were violated.

### *Compliance with Pre-Suit Notification*

198.    Plaintiffs have complied with state law, Fla. Stat. Section 768.28(6)(a), by timely serving a notice of the claim to the Department of Financial Services on or about January 6, 2020.

199.    Plaintiffs have complied with state law, Fla. Stat. Section 768.28(6)(a), by timely serving a notice of the claim to Orange County Sheriff's Office, of which SHERIFF MINA is the legal representative, on or about January 7, 2020.

200.    SHERIFF MINA failed to respond to the notice within the statutory six-month period and has therefore subjected itself to the jurisdiction of this Honorable Court.

**COUNT I**
**42 U.S.C. § 1983 FOURTH AMENDMENT VIOLATION OF RIGHT TO BE FREE**
**FROM UNREASONABLE SEARCH AGAINST GATZY AND FARIAS RIOS**

Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 200 as is fully set forth herein.

201.    This Count is brought against Defendants JEREMY GATZY and Defendant DERRICK FARIAS RIOS, each in their individual capacities.

202.    At all times material hereto, Plaintiffs had a clearly established constitutional right under the Fourth Amendment to be free from unreasonable searches.

203.    Any reasonable law enforcement officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

204.    As described herein, GATZY and FARIAS RIOS while acting under the color of law, unlawfully deprived the Plaintiffs of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

205.    GATZY and FARIAS RIOS unreasonably, recklessly, and excessively infringed upon a reasonable expectation of privacy without any reasonable justification or probable cause for entering the backyard.

206.    The Plaintiffs had an obvious interest to privacy within the confines of their home and property.

207.    GATZY and FARIAS RIOS had no arrest warrant, search warrant, or probable cause to enter and fire gun shots inside the Plaintiff's property.

208.    GATZY and FARIAS RIOS acted in an excessive and shocking manner, resulting in a reckless disregard of the Plaintiffs' rights.

209.     GATZY and FARIAS RIOS' unauthorized entry into the Plaintiff's property and use of force as described herein was objectively unreasonable and was undertaken intentionally and with willful indifference to the constitutional rights of Plaintiffs.

210.     These actions were in violation of the Plaintiffs' rights under the Fourth Amendment of the United States Constitution.

211.     The Fourth Amendment of the United States Constitution provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the pace to be searched, and the persons or things to be seized. U.S. Const. amend. IV

212.     GATZY and FARIAS RIOS reasonably knew, or should have reasonably known, and understood that the homeowner had a constitutionally protected expectation of privacy.

213.     GATZY and FARIAS RIOS, prior to the entry into the gated backyard, reasonably knew or should have reasonably known that they did not have the legal right to enter the Plaintiffs' gated backyard, when no warrant was issued to enter the premise, no probable cause supported by an affidavit existed, and other procedures that were required to be taken before the decision to enter a residence were not followed.

214.     Reasonable officers in the position of GATZY and FARIAS RIOS would know or should know that the entrance into the private and gated backyard was improper.

215.     GATZY and FARIAS RIOS acted recklessly, given that the Plaintiffs were home and available to give consent to enter their backyard, the circumstances related to the apprehension of Leroy Deleon King III were non-exigent, and the backyard was enclosed by a fence and secured by a gate.

216.     GATZY and FARIAS RIOS's conduct was arbitrary, unreasonable, and deliberately indifferent to the constitutional rights of the Plaintiffs, as their investigation lacked the required formal process.

217.     While acting under the color of law, GATZY and FARIAS RIOS acted with reckless disregard towards the rights of the Plaintiffs in entering their gated backyard and has violated their Fourth Amendment rights.

218.     GATZY and FARIAS RIOS acted outside their discretionary authority, as deputies and violated a clearly established constitutional right of which a reasonable person would have known.

219.     In the alternative, if GATZY and FARIAS RIOS acted within their discretionary authority, they violated a clearly established constitutional right of which a reasonable person would have known.

220.     As a direct and proximate result of GATZY and FARIAS RIOS' conduct, KIMBERLY and WINSTON  have been damaged in various respects including but not limited to: suffering emotional distress due to the severe nature of the incident as well as no longer feeling safe in their home or protected by law enforcement, all of which are attributable to the deprivation of their constitutional and statutory rights guaranteed by the Fourth Amendment of the Constitution of the United States and protected under 42 U.S.C. § 1983.

          **WHEREFORE**, Plaintiffs, KIMBERLY VANDERBILT and WINSTON DECAMBRE, demand judgment against Defendant JEREMY GATZY and Defendant DERRICK FARIAS RIOS, respectively, for compensatory and special damages, together with interest, costs and attorney's fees to the extent allowed by law, and any other relief the Court deems just and appropriate.

## COUNT II
## 42 U.S.C. § 1983 FOURTH AMENDMENT VIOLATION OF RIGHT TO BE FREE FROM UNREASONABLE SEIZURE AGAINST GATZY AND FARIAS RIOS

Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 200 as is fully set forth herein.

221.     This Count is brought against Defendant JEREMY GATZY and Defendant DERRICK FARIAS RIOS, each in their individual capacities.

222.     At all times material hereto, Plaintiffs had a clearly established constitutional right under the Fourth Amendment to be free from unreasonable seizures.

223.     Any reasonable law enforcement officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

224.     As described herein, GATZY and FARIAS RIOS while acting under the color of law, unlawfully deprived the Plaintiffs of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

225.     GATZY and FARIAS RIOS unreasonably, recklessly, and excessively used unnecessary force without any reasonable justification or probable cause when discharging their firearms at Audi.

226.     GATZY and FARIAS RIOS acted in an excessive and shocking manner, exhibiting a reckless disregard for the Plaintiffs' rights.

227.     GATZY and FARIAS RIOS' actions and use of force described herein were objectively unreasonable and were undertaken intentionally and with willful indifference to the constitutional rights of the Plaintiffs.

228.     These actions were in violation of the Plaintiffs' rights under the Fourth Amendment of the Constitution of the United States.

229.     The Fourth Amendment of the United States Constitution provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the pace to be searched, and the persons or things to be seized. U.S. CONST. amend. IV

230.     GATZY and FARIAS RIOS, prior to the shooting of Audi, reasonably knew, or should have reasonably known, and understood that the owner of the dog had a constitutionally protected property interest in Audi.

231.     GATZY and FARIAS RIOS reasonably knew or should have reasonably known that they did not have the legal right to shoot Audi multiple times when Audi posed no threat to them, other officers, or K9 Drako, and other non-lethal alternatives should have been utilized before the decision to use lethal force was made.

232.     Reasonable officers in the position of GATZY and FARIAS RIOS would know or should know that the immediate use of lethal force was improper.

233.     GATZY and FARIAS RIOS acted recklessly given that, the Plaintiffs were home, available, and capable of removing Audi from the backyard or warning of her presence, the location of the incident was in a residential neighborhood, the non-aggressive confrontation related to Leroy Deleon King III, and Audi's small size.

234.     GATZY and FARIAS RIOS' conduct was arbitrary, unreasonable, and deliberately indifferent to the constitutional rights of the Plaintiffs since Audi had neither bitten, nor shown aggression towards either deputies or K9 Drako.

235.     While acting under the color of law, GATZY and FARIAS RIOS acted with reckless disregard towards the rights of the Plaintiffs by shooting Audi and therefore, deprived the Plaintiffs of their property under the Fourth Amendment.

236.     GATZY and FARIAS RIOS acted outside their discretionary authority as deputies and violated a clearly established constitutional right of which a reasonable person would have known.

237.     In the alternative, if GATZY and FARIAS RIOS acted within their discretionary authority, they violated a clearly established constitutional right of which a reasonable person would have known.

238.     As a direct and proximate result of GATZY and FARIAS RIOS' conduct, KIMBERLY and WINSTON have been damaged in various respects including but not limited to: suffering emotional distress due to severe nature of the situation as well as being deprived of Audi as she once was in an uninjured state, all of which are attributable to the deprivation of their constitutional and statutory rights guaranteed by the Fourth Amendment of the Constitution of the United States and protected under 42 U.S.C. § 1983.

        **WHEREFORE**, Plaintiffs, KIMBERLY VANDERBILT and WINSTON DECAMBRE, demand judgment against Defendant JEREMY GATZY and Defendant DERRICK FARIAS RIOS, respectively, for compensatory and special damages, together with interest, costs and attorney's fees to the extent allowed by law, and any other relief the Court deems just and appropriate.

## COUNT III
## NEGLIGENCE AGAINST SHERIFF MINA

        Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 200 as is fully set forth herein.

239.     This Count is brought against SHERIFF MINA under the doctrine of respondeat superior for the negligent acts of GATZY and FARIAS RIOS that were the proximate cause of damages to Plaintiffs.

240.     GATZY and FARIAS RIOS owed KIMBERLY and WINSTON a duty of care to act such as reasonable deputies would when confronted by a dog.

241.     GATZY and FARIAS RIOS breached their duty of care by shooting at Audi instead of utilizing non-lethal alternatives as specified in OCSO policies and procedures.

242.     SHERIFF MINA is vicariously liable for the actions of GATZY and FARIAS RIOS.

243.     As a direct and proximate result of such unconstitutional policies and procedures, KIMBERLY and WINSTON have been damaged in various respects including, but not limited to: suffering emotional distress due to severe nature of the situation as well as being deprived of Audi as she once was in an uninjured state, all of which are attributable to GATZY and FARIAS RIOS using lethal force.

**WHEREFORE**, Plaintiffs, KIMBERLY VANDERBILT and WINSTON DECAMBRE, demand judgment against SHERIFF MINA for compensatory and special damages, together with interest, and any other relief the Court deems just and appropriate.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter judgment in their favor and against Defendants, and enter an order:

(a) Declaring the actions of the Defendants described above as a violation of Plaintiffs' constitutional rights under the Fourth Amendment of the United States Constitution;

(b) Requiring the Defendants to implement a non-lethal policy when encountering companion animals;

(c) Awarding Plaintiff compensatory and consequential damages, including damages for emotional distress and loss of intrinsic value in an amount to be determined at trial;

(d) Awarding Plaintiff attorney's fees and the costs associated with this action, including

those associated with expert witness fees, if any, on all claims allowed by law;

(e) Awarding Plaintiff pre-judgment and post-judgment interest at the lawful rate; and

(f) Awarding Plaintiff any further relief that this Court deems just and proper, and any

other relief as allowed by law.

## PLAINTIFF DEMANDS A TRIAL BY JURY
## ON ALL ISSUES TRIABLE

Dated: March 18, 2021

Respectfully Submitted:

/s/Marcy I. LaHart, Esq.            /s/ Heidi M. Mehaffey, Esq.
Marcy I. LaHart, Esq.               Heidi M. Mehaffey, Esq.
Florida Bar No. 0967009             Florida Bar No. 118806
Marcy@floridaanimallawyer.com       Heidi@Hartsell-Law.com
                                    Robert N. Hartsell, Esq.
MARCY I. LAHART, P.A.               Florida Bar No. 636207
 207 SE Tuscawilla Road             Robert@Hartsell-Law.com
Micanopy, FL 32667
(352) 545-7001                      ROBERT N. HARTSELL, P.A.
                                    61 NE 1ˢᵗ Street, Suite C
                                    Pompano Beach, Florida 33060
                                    (954) 778-1052

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 18th day of March, 2021, I electronically filed the foregoing with the Clerk of the Courts using the CM/ECF system which will send a notice of electronic filing to: Counsel for Defendants Brian F. Moes, Esq., Walter A. Ketcham, Jr., Esq., and George Ryan Dietrich, Esq., Grower, Ketcham, Eide, Telan, & Meltz, P.A., PO Box 538065, Orlando, FL 32853-8065 (bfmoes@growerketcham.com; lsase@growerketcham.com; grdietrich@growerketcham.com).

/s/Marcy I. LaHart, Esq.
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com

MARCY I. LAHART, P.A.
207 SE Tuscawilla Road
Micanopy, FL 32667
(352) 545-7001